FILED

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
HAMMOND DIVISION (LAFAYETTE)

2009 SEP 18  PM 4: 05

STE... ....... ...CLERK
U.S. DISTRICT COURT
FOR THE NORTHERN DISTRICT
OF INDIANA

THE LAFAYETTE LIFE INSURANCE COMPANY,
MERCY RIDGE, INC., AMERICAN BANK, and all
others similarly situated,

Plaintiffs,

v.

CITY OF MENASHA, WISCONSIN, a municipal
corporation, MENASHA UTILITIES, and MENASHA
STEAM UTILITY,

Defendants.

Case No. **4:09CV0064**

## CLASS ACTION COMPLAINT

Plaintiffs, The Lafayette Life Insurance Company, Mercy Ridge, Inc., and American Bank (collectively hereinafter the "Securities Holders"), on behalf of themselves and all others similarly situated, for their Complaint against Defendants, the City of Menasha, Wisconsin, Menasha Utilities, and the Menasha Steam Utility (the "Steam Utility," defendants are collectively referred to as "Menasha") state:

### Summary of Claims

1.      The Plaintiff Class invested more than $24,000,000 in notes issued by Menasha to finance the construction and renovation of the Steam Utility. These notes are past due and in default. The Plaintiff Class seeks to hold the City of Menasha to its promises to repay these notes. The Noteholders trusted and believed Menasha when Menasha represented that it had contracts and an operational plan in place for the Steam Utility that would produce revenue sufficient to repay these notes. The Noteholders believed Menasha when it represented that it would issue revenue bonds to repay these notes. The Noteholders believed Menasha when it

represented that it would appropriate the funds necessary to cover any deficiencies. And, the Noteholders believed Menasha when Menasha represented that it would create a Special Redemption Fund to collect and secure revenue generated from the Steam Utility to secure the repayment of the notes. Unfortunately, it has become apparent that Menasha had no plan and never intended to make good on its promises. The Class Representatives represent a large array of putative class members including individual investors, retirement funds, unions, church groups, and non-profit organizations whose investments may be lost. There remain other potential defendants not yet named in this lawsuit based on the expectation that tolling agreements will be signed in the hope of preserving time to work out these and other issues. Menasha, however, has refused to enter into a tolling agreement, thereby forcing the noteholders to file suit to preserve their rights.

## Parties

2.      Plaintiff The Lafayette Life Insurance Company is an Indiana corporation with its principal place of business in Indiana. The Lafayette Life Insurance Company purchased and holds $4,185,000 of the 2005 BANs (as defined below) issued and sold by Defendants.

3.      Plaintiff Mercy Ridge, Inc. is a Maryland non-stock membership corporation with its principal place of business in Maryland. Mercy Ridge, Inc. purchased and holds $550,000 of the 2006 BANs (as defined below).

4.      Plaintiff American Bank is a National Association with its principal place of business in Wisconsin. American Bank purchased and holds $550,000 of the 2005 BANs (as defined below) and $1,800,000 of the 2006 BANs (as defined below).

5.      Defendant Menasha is a municipality located in Winnebago and Calumet Counties in the State of Wisconsin. Menasha owns the Steam Utility through Menasha Utilities.

On information and belief, Menasha issued the Securities at issue in this litigation, knowing and intending that those Securities would be purchased and held by investors throughout the United States. As the issuer of the Securities, Menasha had a duty to purchasers and prospective purchasers of the Securities to, among other things, ensure that the Official Statements and related documents associated with the Securities did not misrepresent material facts or omit material facts required to make the facts disclosed in the Official Statements not misleading.

6.    Defendant Menasha Utilities is a division of Menasha that provides utility services to the Menasha area and operates the Steam Utility, including the creation and implementation of the Steam Utility's business plans over the years.

7.    As set forth below, Menasha failed in these duties.

**Subject Matter Jurisdiction and Venue**

8.    This Court has original subject matter jurisdiction under 28 U.S.C. § 1331 and the Securities Exchange Act of 1934, 15 U.S.C. § 78aa due to federal questions. This Court has jurisdiction to hear and determine Plaintiffs' pendent claims for relief arising under the state statutory and common law pursuant to 28 U.S.C. §§ 1331 and 1367 because such claims arise from a common nucleus of operative facts and are so intertwined as to make the Court's exercise of jurisdiction appropriate. This Court also has jurisdiction over any claims arising out of Indiana state law under Indiana Trial Rule 4.4(A), Indiana's long-arm statute.

9.    Venue is proper in this district under 28 U.S.C. § 1391(b) in that a substantial part of the events or omissions giving rise to the claim occurred in this district, and under 29 U.S.C. § 1132(e)(2) in that the harm giving rise to the claims alleged herein took place or one or more of the defendants reside or may be found in this district. Venue is also appropriate in this district for state law based claims under Indiana Trial Rule 4.4(A).

## General Allegations

10.     Menasha is located in northeast Wisconsin, approximately 90 miles north of Milwaukee. Historically, the Menasha industrial base has been built upon the paper industry.

11.     The Menasha Power Plant supplied electricity to Menasha and the surrounding industry and community for decades before Wisconsin Public Power Inc. ("WPPI") contracted with Menasha in the 1980s and assumed responsibilities for generating the community's electricity. After WPPI assumed responsibility for Menasha's electricity production needs, the Menasha Power Plant continued to operate in a supplemental capacity, providing additional electrical output to WPPI when its own electricity generation facilities were operating at peak capacity.

12.     In 2003, Menasha and Menasha Utilities began to investigate alternative uses for the Menasha Power Plant and, by late 2003, had determined that it would convert the plant into a steam plant that could meet the needs of four nearby paper mills vital to Menasha's survival, including Sonoco U.S. Mills Inc. ("Sonoco"), George A. Whiting Paper Company ("Whiting"), Alcan (Pechiney Plastics) Packaging Americas ("Alcan"), and SCA Tissue North America LLC ("SCA") (collectively, the "Paper Mills"). At the time, the Paper Mills were some of the largest employers and taxpayers in Menasha and Menasha had a vested interest in keeping the Paper Mills located in Menasha.

13.     On information and belief, the Paper Mills expressed a desire for Menasha to convert the plant to an industrial steam facility. They contended that such a facility could provide them with a lower steam cost, which would create significant savings to the Paper Mills and eliminate numerous costs incurred by the mills that were associated with their own production of steam. Such a move would improve the respective market positions of the Paper

Mills and make them both more competitive and economically viable. Menasha Utilities would thus effectively serve as an "energy partner" and improve the profitability of Menasha's major industry, the paper industry, and keep them located in Menasha.

14.     By mid-2004, Menasha Utilities determined that it would convert the Power Plant to operate as a coal-burning industrial steam facility that would burn Appalachian coal. This required the installation of a steam distribution system to Sonoco, Whiting, Alcan and SCA.

15.     A Proposed Business Plan was prepared for, and circulated by, Menasha on November 8, 2004, laying out a general plan to convert the Power Plant into an industrial steam facility (the "Steam Utility Project"). This plan asserted that the entire conversion process could be undertaken for a capital cost of $12,500,000. According to the documents circulated by Menasha in connection with the issuance of the Securities, the Power Plant was already equipped to burn Appalachian coal, and that it could continue to operate on this coal under its current regulatory and air permits while producing steam for the Paper Mills. Additional repairs and modifications would need to be made to the plant equipment, and an underground steam distribution system, including a condensate return system, would also need to be installed under streets and sidewalks to the Paper Mills. According to Menasha, the total cost estimate of the Project would be $12,500,000.

16.     Construction of the Steam Utility began in November, 2004, with completion originally expected by November 2005.

### The 2005 BANs are Issued

17.     On February 1, 2005, Menasha issued $12,660,000 in Taxable Steam Utility Revenue Bond Anticipation Notes, CUSIP Number 586499AA3 (the "2005 BANs"), for the stated purpose of financing the engineering, constructing, improving and equipping of a Steam

Utility Plant in Menasha, Wisconsin. The 2005 BANs were authorized by Menasha Resolution Number R-8-05, which included express ratification and approval of the Official Statement and accompanying exhibits.

18.     Certain Plaintiffs purchased these BANs in reliance upon the information provided by Menasha and others through the Official Statement, including accompanying exhibits, the Steam Utility Business Plan prepared on behalf of Menasha, Menasha Utilities and the Steam Utility (this Official Statement, along with all referenced exhibits, is collectively referred to hereinafter as the "2005 Official Statement", a true and accurate copy of which is attached hereto as **Exhibit A**), and other documents. Defendants prepared and distributed these materials both knowing and intending that purchasers and prospective purchasers of the Securities (including the Plaintiffs) would rely on the information set forth in making their decision to purchase the 2005 BANs.

19.     The 2005 Official Statement stated that the entire cost for the Steam Utility Project, including installation of steam distribution systems to Sonoco, SCA, Alcan and Whiting, would be $12,500,000 and would be completed by the end of 2006.

20.     The 2005 Official Statement also represented that Menasha had already secured customers to purchase the maximum steam output capacity of the Steam Utility. It provided that the Steam Utility had four customers whose steam requirements would allow the Steam Utility to produce and sell steam at maximum output capacity, and that Menasha had already entered into definitive Steam Supply Agreements to accomplish this goal with two such customers, Whiting and Sonoco, in October, 2004.

21.     Additionally, the 2005 Official Statement provided that SCA, a third customer, had signed a Letter of Intent to Purchase Steam in November, 2004, and that "as of late

December, 2004, the City and SCA have agreed to the terms of a Steam Supply Agreement. The documents reflecting these negotiations are currently in the final drafting stages." It similarly provided that Menasha was also in "negotiations with Alcan Packaging Corp. for a Steam Supply Agreement with approval of terms and execution of the agreement to occur by July 1, 2005." Thus, the 2005 Official Statement made it appear a foregone conclusion that the Steam Utility would have four paying customers by the middle of 2005 that had committed to purchasing the maximum steam output.

22.     The 2005 Official Statement also misrepresented the basic terms of these Steam Supply Agreements that were already in place or in the final stages of negotiations and drafting. For example, the 2005 Official Statement provides that these Steam Supply Agreements include provisions that would purportedly bind each Steam Utility customer to "purchase all steam it requires for its plant from [the Steam Utility]."

23.     The 2005 Official Statement also misrepresented that a "Special Redemption Fund" would be created to collect and safeguard revenues generated from the operation of the Steam Utility to pay the principal and interest owed on the 2005 BANs as they became due.

24.     Specifically, Menasha covenanted to use this Special Redemption Fund, along with certain proceeds from the issuance and sale of the 2005 BANs that were set aside for payment of interest on the BANs, and all proceeds from the issuance and sale of Steam Utility Revenue Bonds, to pay the principal and interest due on the 2005 BANs.

25.     This covenant included a requirement that Menasha make a monthly transfer into the Special Redemption Fund in an amount equal to one-sixth (1/6) of the next installment of interest due and one-twelfth (1/12) of the installment of principal of the BANs coming due on the next principal payment.

26.     Further, the 2005 BANs stated that they constituted the "first pledge" on the Steam Utility revenue placed in the Special Redemption Fund, and thus payment of the 2005 BANs would be required before Steam Utility revenue could be utilized for any other debts, obligations or expenses.

27.     Thus, the 2005 Official Statement conveyed to Plaintiffs that the Steam Utility would not only be finished and operating at complete capacity by the beginning of 2006, but also that all revenue generated from the Steam Utility's sales, after operation and maintenance costs were paid, would be reserved and deposited into a fund to pay the Noteholders, including the Plaintiffs, the amount owed in interest payments and upon maturity of the 2005 BANs on September 1, 2009 the principal, thus securing the repayment of principal and interest on the 2005 BANs.

28.     The 2005 Official Statement further promised Plaintiffs that, should the income from the Steam Utility and the issuance of any Revenue Bonds not be sufficient to pay the BANs as they mature, Menasha "will appropriate funds to pay any deficiency out of its annual general tax levy or other available funds for such payments including surplus funds of [Menasha's] combined water and electric utility."

### The 2005 Official Statement and Business Plan Intentionally Misrepresent the True Cost of the Steam Utility Project and Fail to Disclose Menasha's Inability to Competently Handle the Conversion Process

29.     Unknown to Plaintiffs, the information provided in the 2005 Official Statement by Menasha and PCI was materially incorrect.  Although Defendants represented that the entire project would cost less than $13,000,000, Menasha quickly spent the initial amount funded by the 2005 BANs, and yet did not accomplish many of the stated purposes of the 2005 BANs, including installation of the steam distribution system.  In fact, as Menasha or those acting on its

behalf would later disclose, much of the funds were spent on items that were unnecessary for the Steam Utility Project.

30.    Despite its representations to the Noteholders that it would issue Steam Utility Revenue Bonds to repay those Noteholders, in November 2005, Menasha instead issued $11,000,000 in General Obligation Notes, ostensibly to obtain additional funding for the Steam Utility Project. Moreover, in direct contradiction of the representations and covenants contained in the 2005 BAN Resolution incorporated into the 2005 Official Statement, and Menasha used revenue from the Steam Utility to pay for the interest that accumulated on these General Obligation Notes. Further, these General Obligation Notes were to mature in 2007, and would thus require repayment prior to the 2005 BANs.

31.    In March, 2006, Menasha issued yet another set of securities to fund the Steam Utility Project. This time, Menasha issued $13,000,000 of short-term BANs, which it then extended in September, 2006, to mature on December 1, 2006. Menasha again breached the covenants it had made in the 2005 Official Statement by pledging to pay for these BANs with proceeds from revenue from or revenue bonds issued for the Steam Utility. Significantly, these violations were never disclosed to the holders of the 2005 BANs.

32.    Thus, by March, 2006, barely one year after issuing the $12,500,000 in 2005 BANs that were supposed to entirely fund the Steam Utility Project, Menasha had already issued almost $40,000,000 in securities obligations directly related to the Steam Utility; Menasha had siphoned off Steam Utility Revenues to pay obligations other than the 2005 BANs; and, Menasha had committed $24,000,000 in obligations that were to be paid out of the Steam Utility revenues before the 2005 BANs matured, despite the fact that these $24,000,000 in obligations

were issued **after** Menasha had covenanted that the 2005 BANs would have first priority on revenues from the Steam Utility.

33.    Further, despite issuing funds above and beyond the $12,500,000 needed to fund the Steam Utility Project and stating that the project was "completed" in the end of 2006, substantial portions of the project were never attempted nor completed.  For example, the steam distribution system to SCA, who represented the largest customer of the Steam Utility, was never installed and funds were not set aside to implement such installation.  No explanation has been given by Defendants as to how the funds that should have paid for installation of a steam distribution system to SCA were used, though it is acknowledged that this unfinished portion of the Steam Utility Project would now cost in the realm of $3,000,000 to $5,000,000.

### The 2006 BANs are Issued

34.    On December 1, 2006, Menasha issued yet another set of securities: $11,500,000 in Taxable Steam Utility Revenue Bond Anticipation Notes, CUSIP Number 586499AB1, for the stated purpose of  converting the Steam Utility to burn Powder River Basin coal, implementing environmental changes to comply with new stack emissions standards, and refinancing Menasha obligations related to funding of the Steam Utility.  The 2006 BANs were authorized by Menasha Resolution Number R-46-06, which included express ratification and approval of the Official Statement and accompanying exhibits (this Official Statement and its referenced exhibits are collectively referred to hereinafter as the "2006 Official Statement" a true and accurate copy of which is attached hereto as **Exhibit B**).

35.    Certain Plaintiffs purchased these BANs in reliance upon the information provided by Menasha and others through the 2006 Official Statement, the Steam Utility Business Plan prepared by Menasha Utilities on June 22, 2006, and other documents.   Defendants

prepared and distributed these materials both knowing and intending that purchasers and prospective purchasers of the Securities (including certain Plaintiffs) would rely on the information set forth in making their decision to purchase the 2006 BANs.

36.    Despite the fact that Menasha had already violated many of its obligations under the 2005 BANs (without disclosing those violations to the holders of the 2005 BANs), the 2006 Official Statement made many of the same covenants and representations that were made in the 2005 BANs.  For example, the 2006 Official Statement provides in identical terms for the establishment and use of the Special Redemption Fund, as discussed above.  However, Menasha hid from the prospective purchasers of the 2006 BANs the material fact that Menasha had already taken money from this allegedly "dedicated fund" for their own purposes and not for the benefit of the holders of the 2005 BANs.  Thus, Menasha failed to disclose that the funds purportedly held in trust in the Special Redemption Fund to secure repayment of the 2005 and 2006 BANs, would and could be accessed by Menasha for other purposes as it deemed necessary.

37.    The 2006 Official Statement also states that additional funds are needed for the Steam Utility Project in order to convert the Steam Utility from a plant that burned Appalachian coal to one that burned Powder River Basin coal.  The 2006 Official Statement claims that this conversion is required by the Steam Supply Agreements because they require that the Steam Utility source the lowest cost coal, and that the price of Appalachian coal increased significantly after the Steam Utility Project was initially undertaken.  The 2006 Official Statement claimed that Appalachian Coal was more expensive than Powder River Basin coal, and that Menasha was required to convert the Steam Utility to burn the cheaper coal.  However, unknown to Plaintiffs at the time, and on present information and belief, these statements were simply false.

11

38.    The 2006 Official Statement also states that additional funds are needed to "implement certain environmental changes to achieve compliance with new stack emissions standards known as maximum achievable control technology ("MACT")."

39.    The 2006 Official Statement makes no mention of needing additional funds due to negligent, reckless or fraudulent mismanagement of construction funds or to pay for penalties imposed on the Steam Utility for failure to meet the supply terms in the Steam Supply Agreements. Plaintiffs were unaware of these issues when they purchased the 2006 BANs.

## The 2006 Official Statement Misrepresents or Omits Material Facts Relating to Pending Litigation

40.    The 2006 Official Statement specifically states that no material litigation was pending at the time of issuance.

41.    The 2006 Official Statement then goes on to note that "Other Legal Matters" include a claim against Menasha by PCI, as well as Menasha's counterclaim against PCI.

42.    The 2006 Official Statement entirely fails to mention that Menasha was seeking at least $7,600,000 in damages against PCI due to PCI's role in mismanaging the Steam Utility Project and causing the Steam Utility Project to run over budget – an amount that exceed 50% of the original total estimate. Further, the 2006 Official Statement does not indicate that Menasha would be willing to settle these claims for $860,000 – barely one tenth of the amount of damages claimed. Instead, Menasha claimed that they would "vigorously pursue" the counterclaims.

43.    Both of these points were material facts that should have been disclosed as Plaintiffs would not have invested in the 2006 BANs had they known that Menasha had hired a management company that was not capable of completing the Project when and as Menasha represented it would be completed.

44.     On information and belief, Defendants intentionally omitted this information in order to induce Plaintiffs into purchasing the 2006 BANs. At a minimum, Defendants' failure to provide truthful disclosures of this material information demonstrates an extreme recklessness as to their truth.

### Defendants Misrepresented or Omitted Material Facts Regarding the Potential Risks and Profitability of the Steam Utility

45.     Both the 2005 and 2006 Official Statements misrepresented material facts relating to the Steam Supply Agreements entered into with the Paper Mills. On information and belief, these misrepresentations were made intentionally and knowingly, or at least with extreme recklessness as to their truth, by Defendants.

46.     In these Official Statements, Defendants claim that "[d]uring the term of the Steam Supply Agreements, Menasha Utilities shall deliver all steam required by the purchaser and the purchaser is required to purchase all steam it requires for its plant from the Menasha Utilities." (2006 OS p.16; *see also* 2005 OS p.12). However, Plaintiffs have since discovered that the Steam Supply Agreements contained no such terms. In fact, on information and belief, Sonoco's and Whiting's Steam Supply Agreements provide that they may obtain steam via methods other than the Steam Utility. Further, the Steam Utility's customers are able to unilaterally terminate the Steam Supply Agreements if the cost of steam from the Steam Utility exceeds the costs to Sonoco and Whiting for self-producing their own steam. Thus, despite the stable source of revenue secured by contracts as Menasha represented, the exact opposite was true.

47.     The Official Statements also state that the Steam Utility's customers will bear all costs associated with coal purchases and the operation and maintenance costs of the Steam Utility. However, Plaintiffs have since discovered that the Steam Supply Agreements do not

13

actually pass these costs through to the Steam Utility's customers; in fact, the only amount "passed through" to the Steam Utility's customers are any profits or savings that occur due to lower coal costs. In conjunction with the customers' ability to obtain steam elsewhere when desired, this fact makes it virtually impossible for the Steam Utility to operate at cost, let alone at a profit.

48.     On information and belief, Defendants intentionally omitted this information in order to induce Plaintiffs into purchasing the BANs. At a minimum, Defendants' failure to provide truthful disclosures of this material information demonstrates an extreme recklessness as to their truth.

**Covenants Made By Menasha in the 2005 and 2006 Resolutions Referenced in the 2005 and 2006 Official Statements**

49.     The 2005 and 2006 Official Statements contained numerous identical covenants and agreements made by Menasha in issuing the BANs. These covenants and agreements, each a representation of material fact that was relied upon by Plaintiffs, include the following:

(a)     A covenant to keep all of the covenants and agreements required by the provisions of the Bond Resolution;

(b)     A covenant to neither sell, lease, nor in any manner dispose of the Steam Utility;

(c)     A covenant to establish, charge and collect sufficient rates for services rendered by the Steam Utility to provide adequate funds to pay for the BANs and interest thereon as they became due;

(d)     A covenant to issue the Revenue Bonds as soon as practicable;

(e)     A pledge to appropriate sufficient funds from the Steam Utility revenue to pay the principal of, and interest on, any bonds or notes that became due;

(f)     A pledge to appropriate funds to pay for interest on and the principal of the BANs, if necessary, out of Menasha's annual general tax levy or surplus funds of Menasha's electrical and water utilities; and,

(g)     A pledge to maintain all of the assets of the Steam Utility.

50.     Menasha made these covenants and pledges despite its knowledge, or reckless disregard for the truth, that the Steam Supply Agreements would not allow the Steam Utility to charge profitable rates such that the BANs would be repaid or Revenue Bonds would be issued. Further, Menasha had no intent to use Steam Utility revenue to fund the Special Redemption Fund for the sole benefit of the 2005 and 2006 BAN Holders, as required, but instead intended to use any such revenues to pay for interest on General Obligations of Menasha.  For example, Menasha paid almost $1,000,000 of interest on General Obligation Notes in 2008 out of revenue generated by the Steam Utility or for other purposes.  However, Defendants represented in the 2005 and 2006 BANs that such revenues would not be used on any other obligation until the Special Redemption Fund was adequately funded to repay the principal and interest owed on the BANs.

**Defendants Misrepresented or Omitted Material Facts Regarding the Potential Risks and Costs of Addressing Environmental Concerns Necessary to Run the Steam Utility**

51.     In both the 2005 and 2006 Official Statements, Defendants specifically represented that they had the environmental and regulatory permits and approvals needed to operate the Steam Utility and that no additional environmental permits or regulatory approvals

were required. Defendants claimed that modifications to the plant would not effect the existing air permits.

52.     The 2006 Official Statement additionally states that part of the funds needed would be used to comply with new Best Available Control Technology ("BACT") requirements regarding regulation of emissions from the Steam Utility.

53.     However, these statements were false. In fact, the US EPA issued a Notice of Violation to the Steam Utility because the Steam Utility undertook technical upgrades in converting its equipment without obtaining the proper authorizations and permits.

54.     Further, the Wisconsin DNR issued notices of violation to the Steam Utility because the Steam Utility did not have the proper air permit and was not in compliance with BACT requirements. These requirements still have not been met, and the Sierra Club has even filed a civil law suit against the Steam Utility based on these violations.

### Menasha's Anticipation of the Default

55.     Menasha has known that it would be unable to pay the 2005 and 2006 BANs since at least early 2009. In fact, Menasha voted to close the Steam Utility in June, 2009, in breach of covenants made in the Official Statements and as a clear message that Menasha had no intent to issue Revenue Bonds to repay Plaintiffs as required.

56.     As early as June, 2009, Plaintiffs entered into discussions with Menasha regarding the looming default in an attempt to determine whether a settlement or repayment of the soon-to-mature BANs could be worked out. However, despite extensive discussions regarding the potential claims Securities Holders would have against Menasha and the likeliness that litigation would be commenced if Menasha was unable to pay the BANs when they became due, Menasha

determined that it was unable to resolve the Securities Holders' claims or otherwise create a workout plan to avoid default.

57.     One significant hurdle identified by Menasha is that, due to the number of BAN Holders, negotiations with BAN Holders on an individual basis would be "unadministrable." Further, Menasha has been unable to provide a complete list that identifies all holders of the Securities, thus making a class action an appropriate vehicle for resolving these matters.

58.     In addition to Menasha's own awareness and knowledge of these issues and potential claims, Menasha has had extensive verbal and written communications with certain noteholders, including the Plaintiffs from June, 2009 to present about these claims and circumstances.

**Payment Default**

59.     On September 1, 2009, the BANs matured and they were presented to Menasha for payment, as required by the terms of the BANs.

60.     However, Menasha was unwilling or unable to pay the $24,160,000 owed.

61.     Menasha is thus in default on the BANs and has refused to enter into an agreement to preserve the Noteholders rights to file these claims at a later date.

62.     Accordingly, Plaintiffs had no choice but file litigation in order to protect their legal and financial interests.

**Class Allegations**

63.     This action is brought by the Plaintiffs individually and on behalf of two subclasses pursuant to Rule 23(a) and (b)(1), (2) and (3) of the Federal Rules of Civil Procedure. The subclasses are defined as follows:

(a)     Purchasers or holders of the 2005 BANs issued by Menasha; and

      (b)     Purchasers or holders of the 2006 BANs issued by Menasha.

64.    This action is properly maintainable as a class action for the following reasons:

      (a)     Although all noteholders have not been identified, the class is likely to be so numerous that joinder of all members is impracticable and inefficient;

      (b)     There is a well-defined community of interest among class members in questions of law or fact affecting the class which predominate over questions affecting only individual members.  Those common questions include without limitation:

          (i)     whether Defendants actions, described above, violate federal and state securities laws;

          (ii)     whether statements made by Defendants to the investing public misrepresented material facts about the business and operations of the Steam Utility;

          (iii)     whether Menasha breached its contract with Plaintiffs by failing to pay the amount owed on the 2005 and 2006 BANs when they matured on September 1, 2009;

          (iv)     whether Menasha breached its contract with Plaintiffs with respect to its operation of the Steam Utility, its use of the Steam Utility reserves, and its failure to apply and/or appropriate additional city funds to pay the BANs; and

          (v)     to what extent the members of the Class have sustained damages and the proper measure of damages.

      (c)     Claims asserted by plaintiffs are typical of the claims of class members;

(d)     Plaintiffs will fairly and adequately protect the interests of the class in that they have no interests antagonistic to those of the other class members, and plaintiffs have retained as counsel attorneys who are knowledgeable and experienced in federal securities law as well as class and other complex litigation.  True and accurate copies of Sworn Certifications of each proposed named Plaintiff in support of this Complaint are attached hereto as **Exhibit C**;

(e)     A class action is superior to other available methods for the fair and efficient adjudication of this controversy for at least the following reasons:

    (i)     No trustee or other natural entity exists that has the authority or ability to act or negotiate on behalf of the holders of the BANs, and thus a class would allow efficient actions and negotiations toward resolving these matters;

    (ii)     joinder of all class members is impracticable;

    (iii)     when Defendants' liability has been adjudicated, claims of all class members can be determined by the Court with respect to damages;

    (iv)     this action will enable an orderly and expeditious administration of the claims and foster economies of time, effort and expense and ensure uniformity of decisions; and

    (v)     this action does not present any undue difficulties that would impede its management by the Court as a class action.

## **Count I – Federal Securities Fraud**

65.     Plaintiffs incorporate by reference the allegations of paragraphs 1 through 64 hereof, inclusive.

66.     Defendants, in connection with the offer and sale of the Securities, directly or indirectly, made untrue statements of material fact or omitted material facts that were necessary in order to ensure the statements made were not misleading.

67.     Specifically, Defendants stated that they had Steam Supply Agreements in place that permitted the Steam Utility to pass the Steam Utility's operating costs and costs of coal on to the customers, thus making it unlikely if not impossible that the Steam Utility would operate at a loss.  Further, Defendants stated that they had Steam Supply Agreements in place that required that the customers purchase all of their steam requirements from the Steam Utility, and thus would be bound to purchase their steam from the Steam Utility even if cheaper alternatives presented themselves in the future.

68.     Defendants failed to set, maintain, charge, and collect sufficient rates to provide adequate funds to pay for the BANs and interest thereon as they became due.

69.     Defendants also misrepresented the total cost of the Project.

70.     Defendants failed to issue refunding bonds or to appropriate other funds to pay the BANs, all as covenanted or represented in the 2005 and 2006 Official Statements and accompanying Resolutions.

71.     These misrepresentations were made intentionally or in extreme recklessness of the truth.  Defendants must have known that these statements were untrue, and that they did not actually have contracts in place that required the Steam Utility's customers to bear the risk of increased operating or fuel costs; or that required the Steam Utility customers to purchase all of

their requirements from the Steam Utility. Additionally, Menasha did not have contracts in place that allowed the Steam Utility to pass through all operating and fuel costs, but instead placed those risks on the Steam Utility. Thus, it was even possible under the Steam Supply Agreements that the Steam Utility would be contractually obligated to sell steam to its customers at a price drastically below the Steam Utility's own cost.

72.     Defendants also intentionally or recklessly misrepresented that the Steam Utility had all of the necessary permits and approvals to operate the Steam Utility and that it employed the pollution control technology required to operate as a coal-burning steam plant.

73.     However, this statement was simply untrue. In fact, the Wisconsin Department of Natural Resources, Sierra Club, and the United States Environmental Protection Agency, have each filed actions against the Steam Utility or provided notices of violation due to the Steam Utility's failure to comply with environmental requirements and regulations. In addition to fines and costs associated with these environmental actions, the Steam Utility cannot legally operate without spending substantial amounts to install and operate necessary pollution control technology. Plaintiffs would not have purchased the Securities had they known that the Steam Utility was either not in compliance with environmental regulations or had neither a plan nor the intent to seek such compliance.

74.     As demonstrated in this Complaint, Defendants made the above-stated misrepresentations and omissions with the intent to deceive or defraud, or at least with extreme recklessness that they would deceive or defraud, investors in the Securities, including Plaintiffs.

75.     Plaintiffs justifiably relied upon these misrepresentations and omissions of Defendants in purchasing the Securities, and this reliance proximately caused Plaintiffs to suffer

damages in an amount to be determined at trial. Plaintiffs would not have purchased the Securities had they known the truth regarding the misrepresentations and omissions.

### Count II – Violation of State Securities Laws

76.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-75 hereof, inclusive.

77.     Defendants, in connection with the offer and sale of the Securities, directly or indirectly, made untrue statements of material fact or omitted material facts that were necessary in order to ensure the statements made were not misleading, as discussed in detail herein.

78.     Defendants made these misrepresentations and omissions of material fact intentionally, knowingly or recklessly. If Defendants did not have actual knowledge of the misrepresentations or omissions alleged, they would have known the untruth of any such misrepresentation or omission had they exercised reasonable care.

79.     Plaintiffs would not have purchased the Securities had they known the material facts misrepresented or omitted by Defendants; however, they had no such knowledge.

80.     Plaintiffs and other noteholders have been damaged by Defendants' violations of the State Securities Laws including the laws of Indiana, California, Florida, Illinois, Maryland, Michigan, Ohio, and Wisconsin, and potentially others, in an amount to be determined at trial.

### Count III – Breach of Contract (Against Menasha)

81.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-80 hereof, inclusive.

82.     Plaintiffs and Menasha entered into a valid contract for the sale of Securities.

83.     The terms of this contract include an agreement that Menasha would pay Plaintiffs $24,160,000 on or before September 1, 2009, when the Securities at issue matured.

84.    Menasha contracted to issue refunding bonds to fund this payment should the revenues of the Steam Utility be inadequate to make payment in full by September 1, 2009.

85.    Menasha contracted to use the revenues from the Steam Utility to adequately fund a Special Redemption Fund before using such revenues to pay other obligations of Menasha.

86.    Menasha contracted that it would "appropriate funds to pay any deficiency [of the 2005 and 2006 BANs] out of its annual general tax levy or other available funds for such payments including surplus funds of [Menasha's] combined water and electric utility."

87.    Menasha breached that contract by failing to pay Plaintiffs the amount owed on the date the Securities matured and by failing to issue General Obligation Bonds as agreed. Menasha also breached the contract by using revenue from the Steam Utility to pay interest and/or principal on other obligations of Menasha despite the fact that the Special Redemption Fund was not adequately funded per the contract and did not contain sufficient amounts to pay the amount owed the Securities Holders. Menasha further breached this contract by failing to appropriate the necessary funds to pay the deficiencies resulting from Menasha's defaults under the 2005 and 2006 BANs.

88.    As a direct and proximate result of Menasha's breach, the Plaintiffs have suffered damages, including but not limited to damages in the amount owed on the Securities plus interest and attorneys fees.

## Count IV – Common Law Fraud

89.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-88 hereof, inclusive.

23

90.     As demonstrated in the allegations set forth above, Defendants made material misrepresentations and omitted material facts regarding the ability and willingness of the Defendants to repay the Securities as agreed.

91.     Defendants made these misrepresentations intentionally, knowingly, or recklessly without caring whether they were true or false, and with the intent to defraud and to induce Plaintiffs to act upon them.

92.     Plaintiffs believed these misrepresentations to be true and relied on them to Plaintiffs' detriment when purchasing the Securities.

93.     Plaintiffs have been damaged by Defendants' fraudulent conduct in an amount to be determined at trial.

### Count V – Negligent Misrepresentation

94.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-93 hereof, inclusive.

95.     Defendants had a duty to make true representations of material facts relating to the issuance of the Securities.

96.     As detailed herein, Defendants made numerous misrepresentations and statements of material fact that were untrue.

97.     Defendants failed to exercise ordinary care in making these misrepresentations or ascertaining the facts.

98.      Plaintiffs believed the truth of these statements and relied on them in purchasing the Securities.

99.     Plaintiffs have suffered damages, in amount to be determined at trial, as a proximate cause of their reliance.

### Count VI – Unjust Enrichment

100.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-99 hereof, inclusive.

101.     Plaintiffs conferred a benefit on Defendants by purchasing the Securities.

102.     Defendants knew about this benefit at the time it was conferred.

103.     It would be unjust to allow Defendants to retain this benefit because Defendants induced Plaintiffs to purchase the Securities by misrepresenting or omitting material facts about circumstances that would allow Defendants ability to repay the Securities as agreed.

### Count VII – Breach of Fiduciary Duty

104.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-103 hereof, inclusive.

105.     Defendants had a fiduciary duty to Plaintiffs to establish and manage numerous funds on Plaintiffs' behalf, including a Special Redemption Fund that would be used to pay Plaintiffs the amounts owed in principal and interest on the 2005 and 2006 BANs.

106.     Defendants breached this duty by failing to manage these funds appropriately and by using revenue generated by the Steam Utility, that should have been placed in the Special Redemption Fund, for other unauthorized uses.

107.     Plaintiffs have been damaged by this breach of fiduciary duty in an amount to be determined at trial.

### Count VIII – Theft by Virtue of Business (Against Menasha, Menasha Utilities and the Steam Utility)

108.     Plaintiffs incorporate by reference the allegations contained in paragraphs 1-107 hereof, inclusive.

109.    Menasha had possession of money belonging to Plaintiffs because of Menasha's business in constructing and running the Steam Utility.  Specifically, Menasha received revenue from the Steam Utility that it had agreed to hold in trust in a Special Redemption Fund to pay Plaintiffs the amount owed in principal and interest on the Securities.

110.    Menasha intentionally retained possession of this money without Plaintiffs' consent and contrary to Defendants' authority.

111.    Menasha knew that retaining possession of the money was without Plaintiffs' consent and contrary to the Defendants authority.

112.    Menasha intended to convert the money to their own use, and indeed did so by using the money to pay other obligations of Menasha.

113.    Plaintiffs have been damaged by this theft in an amount to be determined at trial that includes actual damages, attorneys fees, costs, and any punitive or exemplary allowed by statute.

### Count IX – Fraudulent Transfer (Against Menasha, Menasha Utilities and the Steam Utility)

114.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-113 hereof, inclusive.

115.    Menasha, Menasha Utilities and the Steam Utility made transfers of the Steam Utility's revenue with the actual intent to hinder, delay, or defraud Plaintiffs.

116.    Specifically, Menasha, Menasha Utilities and the Steam Utility used the Steam Utility's revenue to pay other obligations of Menasha, Menasha Utilities and the Steam Utilities despite their knowledge that the money should have been used to fund the Special Redemption Fund and repay Plaintiffs the amount owed in principal and interest on the Securities.

117.    Further, Menasha, Menasha Utilities and the Steam Utility did not receive a reasonably equivalent value for the amounts transferred, and they intended to incur, or believed or reasonably should have believed that they would incur, debts beyond their ability to pay as they became due.

118.    Plaintiffs have been damaged in an amount to be determined at trial by this fraudulent transfer because the funds transferred should have been used to pay the amount owed on the Securities.  Plaintiffs damages include actual damages, attorneys fees, costs, and any punitive or exemplary allowed by statute.

### Count X – Request for an Accounting of Funds

119.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-119 hereof, inclusive.

120.    Defendants were fiduciaries of Plaintiffs and were responsible for managing proceeds from the 2005 and 2006 BANS and the Steam Utility's revenues in a manner consistent with terms described in the Official Statements and the Resolutions authorizing issuance of the 2005 and 2006 BANs, which establish numerous funds and the order of priority that those funds were to receive Steam Utility revenues.

121.    Plaintiffs request that the Court order that Defendants provide an accounting of funds to demonstrate how the proceeds from the 2005 and 2006 BANs were used, as well as how the Steam Utility's revenues have been used, and to allow Plaintiffs to determine whether, and to what extent, those funds were misappropriated.

### Count XI – Promissory Estoppel

122.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-121 hereof, inclusive.

123.    Menasha promised Plaintiffs that, should the income from the Steam Utility and the issuance of any Revenue Bonds not be sufficient to pay the BANs as they mature, Menasha "will appropriate funds to pay any deficiency out of its annual general tax levy or other available funds for such payments including surplus funds of [Menasha's] combined water and electric utility."

124.    Menasha made this promise while reasonably expecting it to induce Plaintiffs to purchase the BANs.

125.    This promise did, in fact, induce Plaintiffs to purchase the BANs.

126.    Injustice can only be avoided by enforcing this promise and requiring Menasha to appropriate funds to pay the amount owed on the BANs.

## Count XII – Unlawful Taking in Violation of the Article I, Section 13 of the Wisconsin Constitution

127.    Plaintiffs incorporate by reference the allegations contained in paragraphs 1-126 hereof, inclusive.

128.    Article I, Section 13 of the Wisconsin Constitution states that "[t]he property of no person shall be taken for public use without just compensation therefor."

129.    Revenue from the Steam Utility was property of Plaintiffs that Menasha agreed to hold in trust for Plaintiffs until the BANs matured.   This revenue was supposed to be placed in a Special Redemption Fund and used to pay Plaintiffs per the terms of the BANs and the resolutions authorizing their issuance; however, Menasha took these funds and used it to pay public debts and obligations, including interest and principal on General Obligation Notes issued by Menasha.

130.    Menasha did not provide just compensation to Plaintiffs for this taking and using of Plaintiffs' property, and Plaintiffs have been damaged thereby in an amount to be determined at trial.

### Prayer for Relief

**WHEREFORE,** Plaintiffs, on behalf of themselves and class members, request judgment and relief as follows:

(1.)    An order certifying that the action may be maintained as a class action, designating The Lafayette Life Insurance Company, Mercy Ridge, and American Bank as Lead Plaintiffs and certifying them as appropriate class representatives under Rule 23 of the Federal Rules of Civil Procedure and their counsel as Lead Counsel;

(2.)    An order requiring Defendants to issue an accounting of funds for all monies received per the issue of the 2005 and 2006 BANs, as well as for all revenue received by the Steam Utility.

(3.)    Awarding compensatory damages in favor of Plaintiffs and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

(4.)    Awarding Plaintiffs and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

(5.)    Such other and further relief as the Court may deem just and proper.

## **JURY TRIAL DEMANDED**

Plaintiffs hereby demand a trial by jury on all issues so triable.

DATED this _____ 18th _____ day of September, 2009.

ICE MILLER LLP

Michael A. Wukmer
Michael T. McNally
Jacob R. Cox

ICE MILLER LLP
One American Square
Suite 2900
Indianapolis, IN  46282-0200
(317) 236-2100
(317) 236-2219 - fax